LOUIS L. STANTON, U.S.D.J.
Plaintiff J & J Sports Productions, Inc. ("J & J") moves to dismiss Defendant Zeneyda Patin's counterclaim for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted, and to strike Patin's affirmative defenses as insufficient. The motions are granted.
BACKGROUND
Plaintiff J & J brings this action pursuant to The Communications Act of 1934, as amended, 47 U.S.C. § 605 et seq. and The Cable Television Consumer Protection and Competition Act of 1992, as amended, 47 U.S.C. § 553 et seq. Compl. (Dkt. No. 1) ¶ 1. J & J alleges that it was granted the exclusive nationwide commercial distribution rights to "The Fight of the Century: Floyd Mayweather, Jr. vs. Manny Pacquiao WBA World Welterweight Championship Fight Program" (the "Program"), which was telecast nationwide on May 2, 2015. Id. ¶ 15. J & J alleges that it entered into sublicensing agreements with commercial entities granting them the rights to publicly broadcast the Program. Id. ¶ 16.
J & J claims Defendant Zeneyda Patin, an owner of the commercial establishment Crazy Love Studios, intercepted and broadcast the Program at Crazy Love Studios without J & J's authorization. Id. ¶ 18.
Patin counterclaims for a declaratory judgment that 47 U.S.C. §§ 553 and 605"are unconstitutional and violate the United States Constitution ... including specifically the First, Fifth, and Sixth Amendments, in that the statutes are void for vagueness, are overbroad, and violate the fundamentals of due process, including, *321 but not limited to, the lack of sufficient notice to Patin and lack of guidance for enforcement." Answer (Dkt. No. 7) Part III ¶ 17. She states that the statutes lack "any clear guidance" and "are vague as to what conduct may or may not be in violation and/or unlawful conduct," and as a result, "the rights of Freedom of Association under the First Amendment, the denial of 'due process' under the Fifth Amendment, and the Sixth Amendment with respect to 'due process' for statutes involving 'criminal' penalties are potentially violated." Id. ¶ 28. Patin quotes specific provisions of the statutes "[a]s a further clarification" of her claims. Id. ¶ 29. She also pleads rhetorical questions:
A. May Patin, who was not engaged in commerce or doing business as a commercial entity, be held liable for unauthorized receipt and publication of another's commercial television programming where the commercial establishment was not open to the public (i.e., not engaged in commerce) at the time of the receipt and publication?
B. What is the meaning of the term "willfully" within the context of the Telecommunications Act?
C. Did Patin act for "commercial advantage" or "personal financial gain" when she was not engaged in commerce at the time of an alleged violation?
D. Did Patin "assist in intercepting or receiving" and/or "assist in receiving" another's commercial television programming by merely occupying a commercial establishment which was not open to the public (i.e., not engaged in commerce) at the time of the receipt?
Id. ¶ 30.
Patin states that she seeks declaratory relief so that she and "others similarly situated in the public can conform their conduct to the terms of the statute, as well as the citizens of the United States can conduct their activities according to the statute without risk of civil liability and/or criminal prosecution." Id. ¶ 27.
Patin also asserts two affirmative defenses, waiver and failure to mitigate damages. Id. Part II ¶¶ 1-16.
As to waiver, she alleges that J & J agreed to pay an auditor if the auditor "successfully observed and documented unauthorized reception of the Program by commercial entities," and that "J & J and/or Auditor discovered that the Program would be received and published at Crazy Love Studios, without J & J's authorization." Id. ¶¶ 3, 5. She states, "At no time during his visit to Crazy Love Studios did Auditor educate, inform, or warn Patin of J & J's existence or the requirement to purchase a license from J & J to receive the Program at a commercial establishment." Id. ¶ 7. She alleges that because "J & J was aware of its rights to prevent, stop, or demand cessation of the unauthorized receipt of the Program and undertook no act to do so," J & J "allowed and/or consented to receipt of the Program at Crazy Love Studios and ... thereby waived its property rights with respect to this lawsuit." Id. ¶¶ 8-9.
As to the defense of failure to mitigate damages, Patin states that by allowing reception of the Program at Crazy Love Studios and failing to educate, inform, or warn Patin of the need to purchase a license to receive the Program, "J & J failed to take reasonable steps to mitigate its purported damages before, during, and after Patin received the Program at Crazy Love Studios." Id. ¶¶ 14-16.
DISCUSSION
J & J argues that because Patin lacks standing to bring her counterclaim, the Court lacks subject matter jurisdiction over it. Fed. R. Civ. P. 12(b) (1). The Supreme Court has established that
[T]he irreducible constitutional minimum of standing contains three elements.
*322 First, the plaintiff must have suffered an injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of ... Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.
Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations and internal quotation marks omitted). A "[d]eclaratory judgment, like an injunction, is a form of prospective relief that requires a plaintiff to show 'a sufficient likelihood that he or she will again be wronged in a similar way.' " An v. City of New York, 230 F.Supp.3d 224, 231 (S.D.N.Y. 2017) (citing Marcavage v. City of New York, 689 F.3d 98, 103 (2d Cir. 2012) ; City of Los Angeles v. Lyons, 461 U.S. 95, 111, 103 S.Ct. 1660, 1670, 75 L.Ed.2d 675 (1983) ).
Patin faces the concrete, particularized, and imminent harm of paying up to $ 110,000 in statutory damages, as well as additional civil liability for any future receipt and publication of cable and satellite television services in violation of 47 U.S.C. §§ 553 and 605. A declaration that the statutes are unconstitutional would redress this injury. See J & J Sports Prods., Inc. v. Dean, No. 10 Civ. 5088, 2011 WL 4080052 (N.D. Cal. Sept. 12, 2011) ("Standing is satisfied because Defendants have allegedly been injured by the enforcement of the two provisions [ 47 U.S.C. §§ 553 and 605 ] whose constitutionality is challenged, the enforcement action is contingent on the validity of the two provisions, and an order declaring the provisions are unconstitutional would preclude Plaintiff's two claims against Defendants.").
J & J does not challenge any of the required elements of standing, but rather argues that Patin overreaches in seeking a declaration regarding potential criminal liability when she states that declaratory relief would help her conform her "conduct to the terms of the statute ... without risk of civil liability and/or criminal prosecution." Answer Part III ¶ 27. Although criminal prosecution is unlikely and Patin is not under any actual or imminent threat of that, civil liability is a clear threat in this action and confers standing[1] to challenge the constitutionality of the statutes.
Patin makes four claims: (1) the statutes are unconstitutionally vague and overbroad, do not give fair notice of what actions are prohibited, and are unenforceable, (2) knowing of Patin's intent to broadcast the Program and sending J & J's auditor to the broadcast where he could have prevented the violation by warning Patin, J & J consented to the broadcast and waived its right to complain of it, (3) failing to warn Patin, when it had ample opportunity to do so, was not only a failure to mitigate damages, but a defense to this suit, and (4) the $ 110,000 damages claim is excessive.
1. Statutes Are Vague and Overbroad
Patin does not particularize any respect in which the statutes are vague or overbroad. She suggests that the phrases "unauthorized interception or receipt," "no person shall intercept or receive or assist in intercepting or receiving any communication service offered over a cable system," "committed willfully," and "for purposes of commercial advantage or private financial gain" raise questions that do not "... give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly."
*323 Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298-99, 33 L.Ed.2d 222 (1972).
On the contrary, the statutes are clear. 47 U.S.C. § 553 states,
No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.
47 U.S.C. § 553(a)(1). It defines the term "assist in intercepting or receiving" as including the manufacture or distribution of the black boxes with which the unauthorized interception is accomplished. Id. § 553(a) (2). "Cable system" is defined as "a facility ... that is designed to provide cable service which includes video programming and which is provided to multiple subscribers within a community," with stated exceptions. Id. § 522(7). Those terms are neither so vague that people of ordinary intelligence would not understand them, nor encourage arbitrary and discriminatory enforcement. The prohibited actions are neither vague nor overbroad; they are clearly defined and clearly prohibited. They do not, as Patin claims to fear, preclude her from watching television programs with others at her commercial establishment or from obtaining information from media outlets, nor otherwise interfere with any rights relating to the freedoms of assembly or association.
Accordingly, J & J's motion to dismiss Patin's counterclaim is granted.
2. Waiver
"[A] claim of waiver requires proof of an intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it." Capitol Records, Inc. v. Naxos of Am., Inc., 372 F.3d 471, 482 (2d Cir. 2004) (internal citations and quotation marks omitted). "Waiver cannot be created by negligence, oversight, or thoughtlessness; instead, it must be proved that a party intentionally or voluntarily waived a contractual right or advantage." Wyeth v. King Pharmaceuticals, Inc., 396 F.Supp.2d 280, 290 (E.D.N.Y. 2005) (internal citations and quotation marks omitted). It "may not be inferred from mere silence or inaction." Flo & Eddie, Inc. v. Sirius XM Radio Inc., 80 F.Supp.3d 535, 540 (S.D.N.Y. 2015) (internal citations and quotation marks omitted).
The defense of waiver is unsustainable on its facts. There is no showing of any intention on J & J's part to forego its litigating position.
The pleadings make clear that after the auditor had determined that Patin was a likely prospective violator who planned to broadcast the Program, he attended the broadcast for the purpose of verifying the violation and obtaining evidence of its circumstances. As Patin herself alleges, he was there to lay the foundations for the lawsuit, and to provide to J & J an affidavit which documented the unauthorized reception. Answer Part II ¶ 10. Indeed, that affidavit is the probable source of all J & J's pleaded information and belief with respect to the unlawful interception and broadcast in Complaint ¶¶ 8-13.
That is inconsistent with any consent or acquiescence by J & J in the unlawful broadcast; it rather establishes a coherent and unwavering plan to identify, verify, and prosecute the illegal interception and broadcast.
J & J's motion to strike the defense of waiver is granted.
3. Obligation to Warn Patin
Although she claims that a telephone call from J & J or an admonition from the auditor would have caused her to abandon the broadcast, Patin gives no support for the implied assertion that they were under any obligation to do so. Indeed, in one of the cases on which Patin relies, *324 J & J Sports Prods., Inc. v. Bouton, No. 12 Civ. 5762, 2015 WL 12979116, at *2 (N.D. Cal. May 13, 2015), the court struck a defense of unclean hands, stating
Defendants once again fail to demonstrate how plaintiff's knowledge of their plans to broadcast the Program at Los Vecos rises to 'inequitable conduct' sufficient to sustain this affirmative defense. Plaintiff did not induce defendants into broadcasting the Program illegally, nor did they bear any obligation to protect defendants from the consequences of doing so.
The statutes give notice of the illegality of the broadcast. Section 553 clearly forbids what Patin contemplated, and provides for damages, either from $ 250 to over $ 10,000 as the court considers just for the interception, or up to $ 50,000 if the violation was willful[2] and to obtain commercial advantage or private financial gain. 47 U.S.C. § 553 (c) (3) (A)-(B). On the other hand, it provides that if "the violator was not aware and had no reason to believe that his acts constituted a violation of this section, the court in its discretion may reduce the award of damages to a sum of not less than $ 100." Id. § 553 (c) (3) (C).
J & J's motion to strike the defense of failure to mitigate damages is granted.
4. Excessive Damages
Patin claims that she faces a possibility of over $ 110,000 in damages, but it is clear from the foregoing that a damage award (perhaps as little as $ 100) would take account of the circumstances of the violation. The topic is thus dependent upon the evidence at trial.
CONCLUSION
J & J's motion to dismiss Patin's counterclaim (Dkt. No. 13) and motion to strike her affirmative defenses (Dkt. No. 15) are granted.
So ordered.

Patin recognizes she has no standing to seek redress or clarification on behalf of others, and withdraws any claim to do so. Def. Mem. at 3.

A familiar legal term meaning with the intent to do something the law forbids - with a bad purpose to disobey or to disregard the law.